**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| -against- | |
| NEWURTH S.A., B TRANSFER SERVICES LIMITED,  BT PAYMENT SERVICES NIGERIA LTD, TRANSFERZERO MONEY TRANSFER EP SA, BT PAYMENTS SERVICES UGANDA LTD, ELIZABETH ROSSIELLO, ADAM GOUVEIA, MARLEEN HAYE, CALLUM DRYDEN, MIN-SI WANG, CHARLENE CHEN, LINDA LEVINSON, and TOMOYUKI NII, | Adv. Pro. No. 25-_____ (KBO) |
| Defendants. | |

## COMPLAINT

Plaintiff FTX Recovery Trust ("Plaintiff"), through its undersigned counsel, for

its Complaint against NeWurth S.A. ("NeWurth"), B Transfer Services Limited ("B Transfer"),

BT Payment Services Nigeria Ltd ("BT Payment Services Nigeria"), Transferzero Money

Transfer EP SA ("Transferzero"), BT Payments Services Uganda Ltd ("BT Payment Services

Uganda," and together with B Transfer, BT Payment Services Nigeria and Transferzero, the

"AZA Finance Operating Subsidiaries"), and the individuals Elizabeth Rossiello, Adam

Gouveia, Marleen Haye, Callum Dryden, Min-Si Wang, Charlene Chen, Linda Levinson, and

Tomoyuki Nii (the "AZA Finance Controlling Persons" and, together with NeWurth and the

AZA Finance Operating Subsidiaries, the "Defendants"), alleges the following based upon personal knowledge and upon its investigation to date as to itself and its own acts and the acts of FTX Debtors,[1] and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiff brings this adversary proceeding pursuant to Sections 105 and 542 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code") for the turnover of over $50 million in estate assets.  Plaintiff further asserts claims under Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to recover estate assets that were fraudulently transferred to Defendant NeWurth and the AZA Finance Operating Subsidiaries.  Plaintiff also asserts claims for violations of the automatic stay pursuant to Section 362 of the Bankruptcy Code for Defendant's actions affecting property of the bankruptcy estate.  Plaintiff also seeks to recover under common law for fraud, breach of contract, and unjust enrichment.

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the FTX Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3.      On October 8, 2024, the Court entered the *Findings of Fact, Conclusions of Law and Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates* [D.I. 26404] (the "Confirmation Order").  The Confirmation Order, among other things, confirmed the *Debtors' Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [D.I. 26404-1] (including the Plan

---

[1]      FTX Debtors (or "Debtors") refers to FTX Trading Ltd. and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the FTX "Chapter 11 Cases").

Supplement and all other exhibits and schedules thereto, as may be amended, modified or supplemented from time to time in accordance with its terms, the "Plan").

4.    As of January 3, 2025 (the "Plan Effective Date"), the FTX Recovery Trust was established and, pursuant to § 5.17 of the Plan and ¶ 51 of the Confirmation Order, all Causes of Action and the right to enforce such Causes of Action vested exclusively in the FTX Recovery Trust.[2]  Accordingly, Plaintiff has the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

5.    The FTX Recovery Trust has been tasked with repaying liabilities in an amount of over $15 billion to creditors of the FTX Debtors.  [D.I. 30424].  As of May 30, 2025, the FTX Recovery Trust has distributed approximately $6.5 billion to those creditors.  [D.I. 30570]. Given the estate's significant outstanding liabilities to Creditors, recovery of all estate assets remains a crucial goal.

6.    This action arises from Defendants' brazen effort to defraud Plaintiff of more than $50 million that the FTX Debtors loaned to, and deposited with, BTC Africa S.A. (d/b/a AZA Finance) ("AZA Finance"), a fintech business that purported to be "Africa's leading cross-border payments provider" prior to the collapse of the FTX Group[3] in November 2022.

7.    Beginning in 2021, AZA Finance was desperate for capital and repeatedly requested loans from the FTX Debtors.  The FTX Debtors accommodated AZA Finance's requests, ultimately lending $46 million under three promissory notes, each signed by Elizabeth Rossiello as director and CEO of AZA Finance (collectively, the "Promissory Notes").  The first

---

[2]    Any capitalized terms not defined herein shall have the meaning attributed to them in the Plan.

[3]    The FTX Group is comprised of four Silos: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Debtor FTX.com and its Debtor and non-Debtor subsidiaries.

Promissory Note was issued in December of 2021 (the "December 2021 Note"), the second in March of 2022 (the "March 2022 Note"), and the third in August of 2022 (the "August 2022 Note").

8.      In addition, in January 2022, AZA Finance and the FTX Debtors entered into a Blockchain Value Settlement Agreement (the "BVSA") under which FTX Trading Ltd. would deposit funds into an AZA Finance wallet to facilitate settlement of FTX customer transactions in certain African countries.

9.      Separately, during 2021 and 2022, AZA Finance, its shareholders (including Rossiello as sellers' representative) and the FTX Debtors were negotiating a potential acquisition of AZA Finance by FTX Europe.  In March 2022, AZA Finance and its shareholders entered into a share purchase agreement (the "SPA") pursuant to which Debtor FTX Europe AG ("FTX Europe") would acquire all shares of AZA Finance from the existing shareholders for an aggregate purchase price of $225 million, subject to indemnification holdbacks (the "Acquisition").

10.     Under the SPA, the obligation of FTX Europe to close the purchase and sale of the shares was conditional on, among other things, the receipt of approval for the Acquisition from the UK Financial Conduct Authority (the "FCA Approval").  As of the Petition Date, the FCA Approval had not been obtained, and the SPA terminated in accordance with its terms on November 30, 2022.  While the Promissory Notes expressly provided that the amounts loaned were not consideration for the Acquisition and did not create any binding obligations to enter into or proceed with the Acquisition, the terms of the SPA provided that, in the event of termination of the SPA under certain circumstances, the unpaid balance of the $25 million

December 2021 Note was to be converted into a new series of AZA Finance's preference shares at a price per share reflecting a pre-money valuation of $225 million.

11.     Following the Petition Date, Defendants repeatedly reaffirmed their obligation to repay all of the funds that the FTX Debtors had loaned to and deposited with AZA Finance and assured the FTX Debtors that they would eventually do so.  As a stalling tactic, Defendants sought to negotiate a forbearance agreement, ostensibly to give themselves additional time to secure funding to repay the FTX Debtors.  In reliance on Defendants' misrepresentations that they could and would repay the FTX Debtors if only they could have more time, from January 2023 to October 2024 the FTX Debtors engaged in extended discussions with Defendants in an effort to agree on arrangements for repayment of AZA Finance's debts to the FTX Debtors.

12.     Unbeknownst to the FTX Debtors, however, at the same time that Defendants were pretending that they would repay their debts and stringing the FTX Debtors along with discussions over a forbearance agreement, Defendants were carrying out a fraudulent scheme designed to evade their liability entirely through a purported demerger transaction (the "Luxembourg Demerger").  The FTX Debtors now know that Defendants created a new entity— NeWurth—which, upon the Luxembourg Demerger, took nearly all of the valuable assets of AZA Finance and to this day continues to operate AZA Finance's business, while leaving behind in AZA Finance more than $50 million in liabilities to the FTX Debtors and few or no assets to repay them.  A plan for the Luxembourg Demerger (the "Demerger Plan") was approved by AZA Finance's board on January 31, 2024.  On March 6, 2024, AZA Finance's shareholders approved the Demerger Plan, which became effective on or around the same day.

13.     In October 2024, AZA Finance's counsel informed the FTX Debtors that it had initiated bankruptcy proceedings in Luxembourg (the "Luxembourg Bankruptcy") and requested

that the FTX Debtors submit a formal request for repayment of the amounts owed.  During these conversations, AZA Finance's counsel revealed nothing about the Luxembourg Demerger.

14.    Through the sham Luxembourg Demerger, Defendants fraudulently transferred assets to NeWurth that they admit are owed to Plaintiff, depriving Plaintiff—and, by extension, its creditors—of more than $50 million and unjustly enriching the Defendants.

15.    AZA Finance's bankruptcy filing was timed so that the Luxembourg Demerger would fall just outside the six-month and 10-day "hardening period" under Luxembourg law during which transactions—including the transfer of assets to another entity—can be challenged and reversed in bankruptcy proceedings.  The AZA Finance Controlling Persons' intentional timing of the Luxembourg Bankruptcy to exclude the Luxembourg Demerger from this hardening period further reflects that the entire purpose of the Luxembourg Demerger was to fraudulently avoid the payment of funds belonging to Plaintiff through an asset-stripping demerger followed by a sham bankruptcy.

16.    After the Luxembourg Demerger, NeWurth transferred the assets, including assets owed to Plaintiff, to its subsidiaries.

17.    On June 3, 2025, NeWurth and DLocal Ltd. ("dLocal"), a Uruguay-based cross-border payments platform, each announced that they had reached an agreement for AZA Finance to be acquired by dLocal.  The announcements stated that the closing of this acquisition was subject to regulatory approval.  The deal was reported to value AZA Finance at approximately $150 million, showing that AZA Finance has more than sufficient assets to meet its outstanding liabilities to the FTX Debtors.

18.    Defendants repeatedly misrepresented their willingness to repay the FTX Debtors and desire to enter into a forbearance arrangement to stall repayment of their obligations to the

FTX Debtors and delay potential litigation so that they could orchestrate a fraud pursuant to which they have wrongfully sought to deprive the FTX Debtors and their creditors of more than $50 million—and they now seek to reap the benefits of that brazen fraud through the sale of AZA Finance for $150 million.  Through this Complaint, Plaintiff seeks to hold Defendants accountable and recover the FTX Debtor assets that AZA Finance fraudulently transferred to NeWurth.

## THE PARTIES

19.    Plaintiff FTX Recovery Trust is an entity created and implemented pursuant to the Plan confirmed by the Court that assumed all FTX Debtors' rights and assets.

20.    Defendant NeWurth is a public limited liability company (Société Anonyme) registered in Luxembourg.  NeWurth currently does business as AZA Finance.  AZA Finance is a group of financial services companies that offer payment processing, treasury, and foreign exchange services primarily to the African market.  AZA Finance was founded in Kenya in 2013 as BitPesa Limited ("BitPesa").  BitPesa underwent a restructuring that placed it under the control of Luxembourg holding company BTC Africa SA, which was rebranded as AZA Finance in 2019.  AZA Finance has teams in Africa, Europe, and the United States and maintains offices in the United Kingdom, Spain, the United States, Kenya, Senegal, South Africa, Ghana, Uganda and Nigeria.

21.    Defendant B Transfer is a private limited company registered in the United Kingdom and licensed by the U.K. Financial Conduct Authority.  On July 14, 2017, BTC Africa, SA was listed as a person with significant control over B Transfer in the UK Companies House register.  On May 10, 2024, B Transfer filed a notice in the UK Companies House register that BTC Africa SA's status as a person with significant control had terminated on March 22, 2024.

A separate notice filed on the same day listed NeWurth as a new person with significant control as of March 22, 2024.

22.     Defendant BT Payment Services Nigeria is a NeWurth subsidiary registered in Nigeria.  BT Payment Services holds a Payments Service Provider License from the Central Bank of Nigeria.

23.     Defendant Transferzero is a NeWurth subsidiary registered in Spain and licensed by the Bank of Spain.

24.     Defendant BT Payment Services Uganda is a NeWurth Subsidiary registered in Uganda and licensed by the Bank of Uganda.

25.     Defendant Elizabeth Rossiello is the Founder and Chief Executive Officer of NeWurth and AZA Finance.  Rossiello is an American entrepreneur with experience in the African financial services market.  In 2013, she founded Bitpesa, which was rebranded as AZA Finance in 2019.

26.     Defendant Adam Gouveia is the Chief Financial Officer of NeWurth and former CFO of AZA Finance.  Gouveia has been part of the AZA Finance-related companies since 2016.

27.     Defendant Marleen Haye is the Head of Legal of NeWurth and former Head of Legal of AZA Finance.

28.     Defendant Callum Dryden is the Chief Technology Officer of NeWurth and former Chief Technology Officer of AZA Finance.

29.     Defendants Min-Si Wang, Charlene Chen, Linda Levinson, and Tomoyuki Nii are directors of NeWurth and were formally directors of AZA Finance.

## OTHER RELEVANT PERSONS

30.     FTX Trading Ltd. ("FTX Trading") is a corporation registered in Antigua and Barbuda that conducted business as FTX.com and operated a digital asset trading exchange.  Its principal place of business was in Nassau, Bahamas.  FTX.com is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly owned by Bankman-Fried.

31.     Alameda Research Ltd. ("Alameda Research") is a corporation registered in the British Virgin Islands.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Gary Wang.

32.     Alameda Research (Bahamas) Ltd. ("Alameda Research Bahamas" and together with Alameda Research, "Alameda") is a corporation registered in The Bahamas.  It is a wholly-owned subsidiary of Alameda Research.

33.     FTX Europe, previously known as Digital Assets DA AG, is a Swiss company that was acquired by the FTX Group in March 2022.  Under the Plan, FTX Europe was designated as an excluded entity and is currently in local liquidation proceedings.

34.     BTC Africa S.A. (d/b/a AZA Finance) is a public limited liability company (Société Anonyme) registered in Luxembourg.  In March 2024, NeWurth was purportedly demerged from BTC Africa and all of BTC Africa's assets and liabilities, other than liabilities owed to the FTX Debtors, were transferred to NeWurth.  On October 20, 2024, BTC Africa filed for bankruptcy in Luxembourg and is administered by a court-appointed bankruptcy receiver.

35.     dLocal is a limited liability company registered in Uruguay.  dLocal provides services to facilitate cross-border payments.  On June 3, 2025, dLocal announced that it had reached an agreement to acquire AZA Finance pending regulatory approval, reportedly for $150 million.

36.     Samuel Bankman-Fried was a co-founder of FTX.com, and Alameda.

37.     Caroline Ellison was the co-CEO of Alameda from August 2021 until September 2022, when she was named the sole CEO and director.

38.     Nishad Singh was FTX.com's former Director of Engineering and held ownership stakes in various FTX Group companies.

39.     Zixiao "Gary" Wang was a co-founder of FTX.com and its former Chief Technology Officer and held ownership stakes in various FTX Group companies.

40.     Each of Bankman-Fried, Wang, Singh and Ellison was an "FTX Insider."

41.     Meryem Habibi was AZA Finance's Chief Revenue Officer during the negotiation of the BVSA.

42.     Michael Nderitu is NuWurth's Chief Risk Officer and was formally the Chief Risk Officer of AZA Finance.

## JURISDICTION AND VENUE

43.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Plaintiff's Chapter 11 Estates (the "Estates").  Fed. R. Bankr. P. 7001(1).

44.     This adversary proceeding relates to the FTX Debtors' Chapter 11 Cases filed with this Court on the Petition Date (the "Chapter 11 Cases").

45.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

46.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Bankruptcy Court may enter final orders herein.

-10-

47.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

48.     The statutory predicates for the relief requested herein are Sections 105, 362 and 542 of the Bankruptcy Code, and Sections 1304 and 1305 of Title 6 of the Delaware Code.

49.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff consents to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**FACTUAL ALLEGATIONS**

**I.      The FTX Debtors Enter Into Bankruptcy in November 2022.**

50.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges*

-11-

[D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].

51.     As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  The FTX Insiders used this deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.

II.     **Prior To the FTX Bankruptcy, the FTX Group and AZA Finance Enter Into a Series of Agreements Pursuant To Which the FTX Group Transferred Assets To AZA Finance.**

   A.     **The FTX Group Enters Into a Share Purchase Agreement and Three Promissory Note Agreements with AZA Finance.**

52.     In November 2021, Defendant Rossiello pitched AZA Finance's business of processing payments in Africa to the FTX Group in an introductory call with Bankman-Fried. The call was attended by Defendants Rossiello and Gouveia, and non-party Habibi (then-Chief Revenue Officer).  On the call, Rossiello, Gouvia, and Habibi emphasized that AZA Finance was in need of capital and open to acquisition offers.

53.     In the ensuing weeks, Bankman-Fried continued negotiations with Rossiello over a potential acquisition of AZA Finance.  In the course of those discussions, the structure of a potential deal emerged under which FTX Europe would purchase AZA Finance for $200 million.

54.     As negotiations continued, AZA Finance approached the FTX Group about AZA Finance's precarious financial position.  To keep its business viable, AZA Finance requested a loan.  Bankman-Fried agreed and arranged for Alameda Research to lend AZA Finance $25

million with annual interest at a simple rate of .25% under the December 2021 Note.  Alameda was entitled to demand payment on the December 2021 Note on or after the maturity date of December 31, 2022.  The parties executed the December 2021 Note on December 30, 2021. Rossiello signed the relevant agreement on behalf of AZA Finance.

55.     Discussions over an FTX acquisition of AZA Finance continued into early 2022. On March 1, 2022, AZA Finance and its shareholders entered into the SPA pursuant to which FTX Europe would acquire all shares of AZA Finance from the existing shareholders for an aggregate purchase price of $225 million, subject to indemnification holdbacks.

56.     Following execution of the SPA, AZA Finance continued to need capital, and Defendant Gouveia again approached Alameda about an additional "float loan."  On March 14, 2022, the parties executed the March 2022 Note for another $11 million with annual interest at a simple rate of 12.5%, pursuant to which Alameda was entitled to demand payment on or after the maturity date of March 31, 2023.

57.     As AZA Finance's funding challenges continued over the ensuing months, Defendant Gouveia and Michael Nderitu, AZA Finance's Chief Risk Officer, asked to increase the loan by $10 million.  On August 29, 2022, Alameda and AZA Finance agreed to the August 2022 Note on similar terms to the prior two Promissory Notes, this time for $10 million with annual interest at a simple rate of 12.5%.  Alameda was entitled to seek payment on or after March 31, 2023.  At this point, the FTX Debtors had provided AZA Finance with $46 million to keep the company afloat.

58.     Under the SPA, the obligation of FTX Europe to close the purchase and sale of the shares was conditional on, among other things, the receipt of the FCA Approval.  As of the Petition Date, the FCA Approval had not been obtained.

59.     The SPA provided that the agreement would terminate if the closing of the
Acquisition did not occur on or before November 30, 2022.  Any party to the SPA also had the
ability to extend this longstop date by an additional 61 days (*i.e.*, through January 30, 2023) by
notice to the other parties if the failure to close was due solely to the failure to receive the FCA
Approval, though no parties sought to exercise such extension right, and the SPA therefore
terminated in accordance with its terms on November 30, 2022.

60.     The SPA also provided that, if the closing of the Acquisition did not occur for any
reason other than AZA Finance's breach, then the unpaid balance of the December 2021 Note
would "be converted into shares of a new series of [AZA Finance's] preference shares at a price
per share reflecting a pre-money valuation of $225,000,000."

61.     As discussed below, Defendants have suggested that the December 2021 Note
was converted to equity, but, to the knowledge of FTX, no such equity was ever issued to the
FTX Debtors.  If the December 2021 Note would have been converted to equity, then AZA
Finance would have delivered to the FTX Debtors "shares of [NeWurth] in proportion to their
shareholding in [AZA Finance]" pursuant to the Demerger Plan, which, to date, Defendants have
not delivered to the FTX Debtors, as well as owing $21 million on the remaining Promissory
Notes.

**B.      FTX Trading Limited Enters Into a Blockchain Value Settlement Agreement
with AZA Finance.**

62.     On January 11, 2022, while the SPA negotiations were ongoing, AZA Finance
entered into the BVSA with FTX Trading under which AZA Finance would provide settlement
services to FTX Trading for customers in Nigeria, Tanzania, Uganda, Ghana, and Morocco.

63.     In exchange for providing settlement services, AZA Finance charged a
commission per transaction of between 1% and 3%.  On March 28, 2022, FTX Trading and AZA

Finance entered into an addendum to the BVSA, which raised AZA's commission for Ghana for fiat currency moved on and off of the exchange from 1% to 1.5%.

64.     Pursuant to the BVSA, AZA Finance was empowered to assign some of the settlement services outlined in the BVSA to "BTC Africa Group" companies.  The BVSA defines "BTC Africa Group" to include B Transfer.

65.     Pursuant to the BVSA, FTX Trading deposited digital assets in a cryptocurrency wallet designated by AZA Finance for the purpose of settling trades with various counterparties. On the Petition Date, AZA Finance was holding FTX Trading funds under the BVSA in connection with two transactions that had not yet been settled.  As a result, FTX Trading funds in the amount of 43,594,824.83 Ghanaian Cedis and 70,819 West African CFA Francs remain in NeWurth's possession.

**III.    Defendants Engage in a Deliberate Scheme To Defraud the FTX Debtors and Avoid Their Obligations Under the Promissory Notes and the BVSA.**

66.     After the Petition Date, Defendants executed a fraudulent scheme to try to avoid AZA Finance's obligations to the FTX Debtors and put AZA Finance's assets beyond the FTX Debtors' reach.  First, Defendants intentionally misrepresented their willingness to repay the FTX Debtors and negotiated in bad faith to stall immediate repayment of the amounts owed to the FTX Debtors. During the period in which they kept the FTX Debtors at bay by pretending to be interested in negotiating a forbearance arrangement, Defendants planned a fraudulent, asset-stripping, demerger and bankruptcy strategy.  Defendants then executed the fraudulent Luxembourg Demerger, transferring all assets—including the funds owed to the FTX Debtors—to a new company, NeWurth, leaving their obligations to the FTX Debtors behind in AZA Finance.  They then put AZA Finance into bankruptcy and continued to carry on AZA Finance's business as NeWurth using FTX Debtor assets.

**A.      AZA Finance and Its Controlling Persons Misrepresent Their Willingness and Ability To Repay the FTX Debtors To Buy Time To Execute Their Fraudulent Scheme.**

67.      Shortly after the Petition Date, on November 28, 2022, the FTX Debtors contacted AZA Finance to request additional information about the relationship between AZA Finance and the FTX Group.

68.      On January 19, 2023, counsel for AZA Finance responded to Plaintiff.  Plaintiff had an initial call with AZA Finance on January 23, 2023 to discuss repayment of the Promissory Notes and the amounts due under the BVSA.  Following the call, in a February 2, 2023 letter, Counsel for AZA Finance acknowledged that the Promissory Notes were outstanding and that AZA Finance possessed 43,594,824.83 Ghanaian Cedis and 70,819 West African CFA Francs belonging to the FTX Group under the BVSA.  The letter further represented that "AZA desires and is willing, and understands that FTX equally desires and is willing, to engage in discussions about the current situation and what are best steps forward for all concerned."

69.      The FTX Debtors took the Defendants at their word.  Reasonably relying on AZA Finance's apparent good faith and representation that Defendants were interested in reaching a mutually beneficial solution, the FTX Debtors did not pursue litigation to collect the debts owed by AZA Finance and instead devoted time and estate resources to negotiating a potential forbearance agreement to facilitate AZA Finance's payment of funds owed under the Promissory Notes.

70.      In or around January 2023, the FTX Debtors asked Perella Weinberg Partners ("PWP") to serve as a consultant and carry forward the discussions with AZA Finance about a possible business resolution to AZA Finance's obligations to the Estates.  AZA Finance claimed that the December 2021 Note's potential conversion into equity was preventing it from securing the capital it needed to repay the outstanding Promissory Notes.  It assured PWP that if the FTX

Debtors extended the maturity date for the March 2022 and August 2022 Notes and agreed that the December 2021 Note was converted into equity, AZA Finance would be able to repay the notes with the financing that it would subsequently secure.

71.     On March 20, 2023, AZA Finance sent the FTX Debtors an additional letter requesting (1) payment instructions to transfer $3,000,000 to FTX Europe and (2) an extension of the maturity date of all three Promissory Notes to March 30, 2024.  The letter stated, "AZA is confident that, with an additional 12 months to pay off the loans, it can raise sufficient funds to do so."  The letter further claimed that AZA Finance was prepared to return the fiat currency owed to the FTX Debtors under the BVSA as soon as the FTX Debtors provided bank account or wallet information.

72.     But unbeknownst to the FTX Debtors, Defendants had no intention of ever repaying these obligations.  Instead, Defendants entered into these negotiations with a single goal: buying time to loot AZA Finance of its valuable assets while stranding its liabilities to Plaintiff in a worthless shell.  In furtherance of this fraudulent plan, the AZA Finance Controlling Persons continued to mislead Plaintiff by feigning negotiations toward a forbearance agreement that would facilitate full repayment of AZA Finance's debts.

73.     Unaware of the AZA Finance Controlling Persons' scheme and relying on their repeated promises to work toward a mutually beneficial solution, PWP, on behalf of the FTX Debtors, made a good-faith effort to cooperate with AZA Finance.  On July 31, 2023, PWP had a call with Rossiello on which Rossiello pitched AZA Finance's proposal that the FTX Debtors confirm that the December 2021 Note had converted to equity.  On August 1, 2023, PWP requested access to AZA Finance's virtual data room so that it could properly perform diligence on Rossiello's proposal.  Defendant Marleen Haye, then-Head of Legal and Corporate

Governance for AZA Finance, replied that prior to providing virtual data room access, the FTX Debtors would need to sign a Non-Disclosure Agreement ("NDA").  On August 10, 2023, the FTX Debtors sent AZA Finance their form NDA.  Haye informed the FTX Debtors that AZA Finance would refuse to sign the NDA unless the FTX Debtors agreed that English law would govern the NDA.

74.    Despite this disagreement, PWP went forward with the discussions and tried to obtain financial information from AZA Finance so that it could properly evaluate the viability of a forbearance agreement.  By this point, the AZA Finance Controlling Persons had strung PWP along for nearly *seven months* by providing small bits of information before eventually refusing all further requests.  All the while, the AZA Finance Controlling Persons were planning a sham demerger and bankruptcy to defraud the FTX Debtors of more than $50 million.

75.    Rather than moving discussions with PWP forward, AZA Finance led PWP in circles.  In a September 20, 2023 e-mail to Timm Schipporeit and others at PWP, Haye wrote that AZA Finance urgently needed an extension of the maturity dates for the Promissory Notes so, as she claimed, AZA Finance could find financing or a potential acquirer.  In an October 6, 2023 e-mail in the same thread, Gouveia lamented AZA Finance's weak financial position, blaming its continued inability to secure much-needed capital on the FTX Debtors.[4]

76.    Despite the apparent urgency of finding a solution, the AZA Finance Controlling Persons, including CFO Adam Gouveia, refused to provide PWP with the financial information

---

[4]    Because AZA Finance and its subsidiaries had already been reflected in the FTX Debtors' records as being included in the FTX Group, the FTX Debtors inadvertently included AZA Finance and its affiliated companies in their initial petitions filed with the Bankruptcy Court.  Counsel for AZA Finance contacted the FTX Debtors regarding the issue on November 11, 2022.  Within one hour of AZA Finance informing the FTX Debtors of the actual status of the Acquisition, the FTX Debtors contacted AZA Finance to confirm that they would not proceed with filing bankruptcy petitions for AZA Finance and its affiliates and would take corrective measures.  Counsel for AZA Finance confirmed at the time that it was satisfied with the FTX Debtors' corrective measures.

necessary for Plaintiff to evaluate the viability of a forbearance agreement.  On October 6, 2023, Defendant Gouveia provided PWP with AZA Finance's balance sheet as of July 31 2023, noting the company's current financial weakness and cajoling the FTX Board to confirm the December 2021 Note's conversion to equity and to agree to extend the maturity dates on the March 2022 and August 2022 Notes by eighteen months.  When PWP asked two follow-up questions the next day, however, Gouveia did not respond.  When PWP again followed up on October 20, 2023, Gouveia responded on October 24, 2023, stating that—despite the impending financial disaster that allegedly threatened AZA Finance—AZA Finance would not provide any further information to PWP without an NDA.  AZA Finance declined to respond to PWP's repeated follow-ups.

77.     AZA Finance ceased responding to PWP in late October 2023.  But behind the scenes, Defendants were still working to evade their obligations to the FTX Debtors.  On information and belief—and unbeknownst to the FTX Debtors at the time—by September 19, 2024, the Debtors now understand that AZA Finance had hired Galaxy to find a buyer for AZA Finance and that Galaxy was telling potential purchasers that AZA Finance would restructure to get rid of its debts to the FTX Debtors.

**B.     AZA Finance Structured the Luxembourg Demerger and Bankruptcy To Defraud the FTX Debtors and Avoid Their Obligations Under the Promissory Notes and BVSA.**

78.     On or around January 31, 2024, while purporting to engage in discussions to restructure AZA Finance's debt, and without informing the FTX Debtors or PWP, the AZA Finance Controlling Persons approved the terms of the Luxembourg Demerger.

79.     Pursuant to the Demerger Plan, virtually all of AZA Finance's assets—including the funds that AZA Finance had admitted were owed to the FTX Debtors and AZA Finance's interests in the AZA Finance Operating Subsidiaries—were transferred to a newly formed

-19-

receiving entity:  NeWurth S.A.  By contrast, AZA Finance retained little more than its liabilities to Alameda under the three Promissory Notes.

80.    Under the Demerger Plan, AZA Finance shareholders received shares of NeWurth in exact proportion to their shareholding in AZA Finance, so the shareholders of AZA Finance and NeWurth were identical.  NeWurth also had exactly the same directors as AZA Finance. And despite AZA Finance's insistence that the December 2021 Note had converted to equity, AZA Finance neither informed the FTX Debtors of the Luxembourg Demerger nor attempted to issue the FTX Debtors with shares in NeWurth.  The only purpose of the sham Luxembourg Demerger was to defraud the FTX Debtors.

81.    On February 5, 2024—while still incommunicado with the FTX Debtors—AZA Finance filed the Demerger Plan with the Luxembourg Trade and Companies Register without providing any notice to the FTX Debtors.  According to the Demerger Plan, the aggregate valuation of the assets and liabilities which have been transferred to NeWurth is $21,675,488.88 and the remaining aggregate valuation of the assets and liabilities left at AZA Finance after the Luxembourg Demerger was negative 47,953,491 USD.

82.    AZA Finance's shareholders, including Rossiello, approved the Demerger Plan on March 6, 2024.  On March 19, 2024, the Luxembourg Demerger was published on the Luxembourg Trade and Companies Register.  Despite the Luxembourg Demerger's obvious— and intentional—effect on AZA Finance's ability to repay the FTX Debtors, Defendants did not inform the FTX Debtors about the Luxembourg Demerger.  Instead, the FTX Debtors only learned about the Luxembourg Demerger in early 2025.

83.    On October 20, 2024, shortly after the end of the so-called "hardening period" ("*période suspecte*") during which certain transactions—including transactions in which the

value of what has been given by the bankrupt significantly exceeds the value of what has been received in return—may be challenged and voided in bankruptcy proceedings under Luxembourg law,[5] AZA Finance filed for bankruptcy in Luxembourg. This timing was a deliberate attempt to prevent the FTX Debtors from challenging certain aspects of the sham Luxembourg Demerger.

84.    In October 2023, the Defendants broke off communications with PWP and Debtors without explanation. On January 3, 2024, PWP reached out to Defendants to set up a call and to discuss updates on AZA Finance's 2023 performance and 2024 budget. Defendants did not reply. On January 12, 2024, PWP followed up on this request, again receiving no response.

85.    On October 10, 2024 (*i.e.*, prior to the commencement of the Luxembourg Bankruptcy), the FTX Debtors again e-mailed Defendants asking for an update on payment of the amounts owed on the Promissory Notes and under the BVSA, and who at AZA Finance should be sent the FTX Debtors' payment instructions.

86.    On October 24, 2024, after nearly a year of ignoring the FTX Debtors' repeated communications, counsel for AZA Finance called the FTX Debtors and requested that the FTX Debtors send a formal letter requesting that the funds be repaid, with the cryptic explanation that doing so would help AZA Finance's bankruptcy counsel demonstrate to the Luxembourg Bankruptcy Court that paying the debt was appropriate. Relying on the good faith of the Defendants, the FTX Debtors responded with the requested formal letter the very next day.

87.    But the request from AZA Finance was a trap. AZA Finance had actually requested this letter at this exact moment (*i.e.*, mere days after the expiration of the "hardening

---

[5] See Lux. Com. Code, art. 445.

period") in order to provide a legal basis for the Luxembourg court to approve the Luxembourg

Bankruptcy.

88.    The Luxembourg Bankruptcy was an integral part of AZA Finance's scheme to

fraudulently avoid repaying their liabilities to the FTX Group.

89.    As discussed above, the ownership structure and proportions of AZA Finance and

NeWurth are identical.  The composition of the board of directors is the same.  NeWurth also

had nearly identical assets and liabilities as AZA Finance prior to the Luxembourg Demerger,

except that AZA Finance was left with certain undesirable liabilities, including the obligations

owed to the FTX Group.  NeWurth even does business under the name "AZA Finance."  The

surviving company, NeWurth, is a mere continuation of AZA Finance.

90.    The AZA Finance Controlling Persons that perpetuated this scheme continue to

be employed by NeWurth.  One of the AZA Finance Controlling Persons, Defendant Rossiello,

owned significant equity in AZA Finance (and therefore in NeWurth) and thus obtained

substantial personal benefit from AZA Finance fraudulently shedding the liabilities to the FTX

Group.

91.    Further evidencing the fraudulent intent of the AZA Finance Controlling Persons'

scheme is the fact that the Demerger Plan omitted any discussion of the rationale for the

Luxembourg Demerger, in contrast to the typical practice in Luxembourg, which is to include

this information.  The reason for this omission is clear:  the only purpose of the Luxembourg

Demerger was to defraud the FTX Debtors.

92.    Moreover, the Luxembourg Bankruptcy, which formally began on October 30,

was timed such that the Luxembourg Demerger would fall just outside the six-month and ten-day

look-back period, or "hardening period," in which Luxembourg insolvency law would have

allowed the Luxembourg Demerger to be declared automatically void.  Since the Luxembourg

Demerger was approved on March 6, 2024, it fell outside the hardening period and could not be

automatically voided.  AZA Finance strung the FTX Debtors along with discussions of a

commercial resolution that they did not intend to pursue so it could delay initiating bankruptcy

until it could be sure that the Luxembourg Demerger would not be threatened by the hardening

period.

93.     On information and belief, AZA Finance (prior to the Luxembourg Demerger)

and NeWurth (after the Luxembourg Demerger) financed the AZA Finance Operating

Subsidiaries using funds obtained from the FTX Debtors under the Promissory Notes and the

BVSA.  For example, when negotiating the August 2022 Note, AZA Finance suggested that its

African subsidiaries needed additional capital to settle customer transactions.  According to

Gouveia and Nderitu, AZA Finance had a policy of "pre-funding" customer accounts before

actually receiving funds from a given customer transaction because the local banking

infrastructure was too slow.  Additionally, AZA Finance's subsidiaries in the United Kingdom

and Spain required capital to meet safeguard requirements with respect to customer deposits

under local law.

94.     Moreover, AZA Finance's United Kingdom subsidiary, B Transfer, has reported

receiving significant support from AZA Finance in its recent Annual Reports and Financial

Statements filed with the United Kingdom Companies House.  B Transfer's 2021 Annual Report

indicates that it owed BTC Africa over GBP 9.5 million in 2021.  According to B Transfer's

2022 and 2023 reports, it owed AZA Finance approximately GBP 8 million during both

reporting periods.  At least part of this debt arose out of an intercompany loan between AZA

Finance and B Transfer.  Under the Demerger Plan, this loan was transferred from AZA Finance

to NeWurth.  B Transfer's Annual Report for 2024, which was filed on June 13, 2025, shows that NeWurth forgave GBP 4.5 million of intercompany loans to B Transfer in early 2025.  This represents a further attempt by NeWurth to put estate assets out of reach of FTX Group creditors.

95.     The Demerger Plan further indicates that AZA made intercompany loans to BT Payments Uganda, BT Payment Services Nigeria, and Transferzero.  Each of these intercompany loans was transferred to NeWurth pursuant to the Demerger Plan.

96.     On June 3, 2025, NeWurth—after fraudulently unloading its obligations to Plaintiff—announced that it had entered a deal, subject to regulatory approval, to be acquired by dLocal.  The deal values NeWurth at approximately $150 million.

97.     Through this fraudulent scheme of intentionally delaying the FTX Debtors until Defendants were able to siphon off their assets through the Luxembourg Demerger and file for bankruptcy, Defendants avoided paying their liabilities to the FTX Group while retaining all other assets, including assets belonging to FTX Trading under the BVSA.

### CAUSES OF ACTION

### COUNT ONE
### TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542(a)
### (AGAINST DEFENDANT NEWURTH)

98.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

99.     As alleged above, NeWurth is withholding payments owed under the Promissory Notes with Alameda and the FTX Trading assets transferred under the BVSA.  Plaintiff seeks an order from the Court directing NeWurth to turn over to Plaintiff the amount owed under the Promissory Notes and the BVSA, which are property of the FTX Debtors' bankruptcy estates pursuant to Bankruptcy Code Section 542(a)(1).

100.    In the alternative, in connection to the December 2021 Note, Plaintiff seeks an order from the Court directing NeWurth to turn over to Plaintiff the NeWurth preference shares owed under the December 2021 Note or the value of the shares, which are property of the FTX Debtors' bankruptcy estates pursuant to Bankruptcy Code Section 542(a)(1).

101.    The relief requested also is authorized under the Court's equitable powers codified in Section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

## COUNT TWO
## VIOLATION OF THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(a)
## (AGAINST ALL DEFENDANTS)

102.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

103.    Assets owed by AZA Finance to Alameda under the Promissory Notes and the BVSA constitute property of the estate.

104.    As alleged above, Defendants willfully violated the automatic stay under 11 U.S.C. § 362(a) by causing assets owed under the Promissory Notes and the BVSA to be transferred to NeWurth as part of the Luxembourg Demerger.

105.    Defendants were at all times aware of the pendency of these Chapter 11 Cases. Section 362(k) of the Bankruptcy Code permits an individual injured by a willful violation of the automatic stay to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." See 11 U.S.C. § 362(k)(1).

106.    Plaintiff was harmed by Defendants' violation of the automatic stay because, among other reasons, it has been forced to expend considerable resources to recover its property.

107.    Accordingly, Plaintiff is entitled to compensatory and punitive damages under 11 U.S.C. § 362(k)(1).

## COUNT THREE
## COMMON LAW FRAUD UNDER DELAWARE LAW
## (AGAINST ALL DEFENDANTS)

108.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

109.    As alleged above, Defendants made false representations post-petition to the FTX Debtors regarding Defendants' desire to seek a forbearance agreement and willingness to engage in a commercial resolution.

110.    Defendants knew these representations to be false, had the belief that the representations were false, or made the representations with reckless indifference to the truth.

111.    Defendants made these false representations with an intent to induce the FTX Debtors to act or to refrain from asserting their legal rights, including their rights under the Promissory Notes and the BVSA while Defendants transferred all of their assets and liabilities to NeWurth.

112.    The FTX Debtors refrained from acting in justifiable reliance upon these false representations.

113.    There was damage to Plaintiff as a result of this reliance.

## COUNT FOUR
## ACTUAL FRAUDULENT TRANSFERS PURSUANT TO 6 DEL. CODE ANN. TIT. 6, § 1304(a)(1)
## (AGAINST DEFENDANT NEWURTH)

114.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

115.    The fraudulent transfers are avoidable pursuant to the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1304(a)(1).

116.    AZA Finance, the debtor under its Luxembourg Bankruptcy case, made the transfer of assets to NeWurth through the Luxembourg Demerger set forth in paragraphs 66 through 97.  These transfers involved the property of AZA Finance and the FTX Group.

117.    Each of these transfers was made with the actual intent to hinder, delay or defraud Plaintiff, which is AZA Finance's creditor.

118.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1), and Plaintiff may recover from Defendant NeWurth the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the bankruptcy estates.

## COUNT FIVE
### CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO 6 DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305
### (AGAINST DEFENDANT NEWURTH)

119.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

120.    In the alternative to Count Four, the fraudulent transfers are avoidable pursuant to the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305.

121.    AZA Finance, the debtor in the Luxembourg Bankruptcy, made the transfer of assets to NeWurth through the Luxembourg Demerger as set forth in paragraphs 66 through 97. These transfers involved the property of AZA Finance and the FTX Group.

122.    AZA Finance: (1) became insolvent as a result of these transfers; (2) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; and (3) intended to incur, or

believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

123.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and Plaintiff may recover from Defendant NeWurth the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the debtors' bankruptcy estates.

**COUNT SIX**
**BREACH OF CONTRACT UNDER DELAWARE LAW**
**(AGAINST DEFENDANT NEWURTH)**

124.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

125.    AZA Finance entered into the BVSA with FTX Trading.

126.    AZA Finance entered into the December 2021 Note with Alameda Research, which matured and became due on December 31, 2022.  AZA Finance did not return the principal amount of the loan when it became due and payable and has not made any payments after that date.

127.    AZA Finance entered into the March 2022 Note with Alameda Research, which matured and became due on August 31, 2023.  AZA Finance did not return the principal amount of the loan when it became due and payable and has not made any payments after that date.

128.    AZA Finance entered into the August 2022 Note with Alameda Research, which matured and became due on August 31, 2023.  AZA Finance did not return the principal amount of the loan when it became due and payable and has not made any payments after that date.

129.    AZA Finance retains 43,594,824.83 Ghanaian Cedis and 70,819 West African CFA Francs in breach of the BVSA.

130.    Plaintiff has incurred damages from the loss of funds under the BVSA and the non-payments under the Promissory Notes.

131.    NeWurth, the sole surviving company from the Luxembourg Demerger, having identical shareholders and directors to AZA Finance, as well as receiving nearly all of AZA Finance's assets, is dominated and controlled by AZA Finance such that its separate existence must be disregarded.

132.    NeWurth is a mere continuation of AZA Finance and should be held liable under these contracts.

**COUNT SEVEN**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

133.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 97 as if fully set forth here.

134.    In the alternative to Counts One through Six, as alleged above, Defendants received the direct benefit of funds from Alameda under the Promissory Notes and from FTX Trading under the BVSA, notwithstanding that Defendants did not return the amounts owed under the Promissory Notes or the BVSA.  Accordingly, Defendants have been enriched, while Plaintiff and its creditors have been impoverished as a result.

135.    Under the circumstances as alleged herein, allowing Defendants to retain the benefit of the funds from Alameda and FTX Trading would unjustly enrich Defendants.  The unjust enrichment of Defendants, to the detriment of Plaintiff who funded the payments under the Promissory Notes and BVSA, has caused Plaintiff damages.

136.    Should the Court find that Plaintiff has no remedy at law, Plaintiff seeks recovery in equity.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

137.    Enter an order under 11 U.S.C. § 541(a) and 105(a) directing the turnover of (a) $46 million, (b) 43,594,824.83 Ghanaian Cedis, and (c) 70,819 West African CFA Francs to Plaintiff;

138.    Enter an order under 11 U.S.C. § 362(k)(1) awarding Plaintiff compensatory and punitive damages arising out of Defendants' violation of the automatic stay;

139.    Award Plaintiff damages arising out of Defendants' fraud;

140.    Enter an order determining that the transfers addressed herein are avoidable fraudulent transfers under Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305;

141.    Award Plaintiff (a) the return of property to the Plaintiff's bankruptcy estates that is the subject of the avoidable fraudulent transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable fraudulent transfers alleged herein;

142.    Award Plaintiff (a) the amount due under the Promissory Notes alleged herein; or (b) monetary damages reflecting the applicable value alleged herein;

143.    In the alternative, to the extent it is determined that the December 2021 Note converted to equity, award Plaintiff (a) preferred shares of NeWurth due under the December 2021 Note; or (b) the monetary value of these shares;

144.    Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

145.    Award Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated:  July 1, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       gluecksteinb@sullcrom.com
       decampj@sullcrom.com

*Counsel for Plaintiff*